# Exhibit 2

![Center for Immigration Studies logo]

# HHS-ACF FOIA REQUEST

**VIA EMAIL**                                                                                                           December 18, 2023

      Re:    Missing UAC zip codes (CIS#0106)

Dear Freedom of Information Officer:

**A. Requested Records**

Pursuant to the Freedom of Information Act ("**FOIA**"), 5 U.S.C. § 552, the Center for Immigration Studies ("**the Center**"), hereby requests ("**FOIA Request**") the following records to be provided in a searchable electronic form to foia@cis.org:

> **The zip code for each sponsor associated with each unaccompanied alien child that the agency could not reach after its "safety and wellbeing call",[1] since January 1, 2021 through the date of the search.**
>
> **Information helpful to fulfilling the request: According to the New York Times, "H.H.S. checks on all minors by calling them a month after they begin living with their sponsors, data obtained by The Times showed that over the last two years, the agency could not reach more than 85,000 children. Overall, the agency lost immediate contact with a third of migrant children." This request is interested in records sufficient to show the zip codes for each sponsor associated with each child HHS could not reach after its follow up calls to children who began living with their sponsor, since January 1, 2021 through the date of the search.**

If any responsive record or portion thereof is claimed to be exempt from production under the provisions of FOIA, please provide sufficient identifying information with respect to each allegedly exempt record, or portion thereof, to allow the Center to assess the propriety of the claimed exemption. *Vaughn v. Rosen*, 484 F. 2d 820 (D.C. Cir. 1973). In addition, any portion of a responsive record that can be reasonably segregated must be provided, after redaction of any

---

[1] https://oversight.house.gov/release/hearing-wrap-up-orr-director-fails-to-answer-questions-about-85000-lost-unaccompanied-alien-children-flawed-vetting-of-sponsors-and-more%EF%BF%BC/ (Statement made by Robin Dunn Marcos, Director of the Office of Refugee Resettlement, during Subcommittee on National Security, the Border, and Foreign Affairs hearing titled "Oversight of the Office of Refugee Resettlement's Unaccompanied Alien Children Program."

exempt material. 5 U.S.C. § 552 (b). The Center will accept a "rolling production" of documents if necessary to facilitate the production of responsive records.

For the purpose of this FOIA Request, the term "record" shall mean: 1) any written, printed, or typed material of any kind, including without limitation all correspondence memoranda, notes, messages, letters, cards, facsimiles, papers, forms, telephone messages, diaries, schedules, books, reports, calendars, chronological data, minutes, charts, lists, ledgers, invoices, worksheets, receipts, returns, computer printouts, printed matter, prospectuses, statements, checks, statistics, surveys, affidavits, contracts, agreements, transcripts, magazine or newspaper articles, or press releases; 2) any electronically, magnetically, or mechanically stored material of any kind, including without limitation all electronic mail, email, text messages, or chats; 3) any audio, aural, visual, or video records, recordings, or representations of any kind; 4) any graphic materials and data compilations from which information can be obtained; and 5) any materials using other means of preserving thought or expression.

### B. Fee Waiver Request

The Center also hereby requests a waiver of any and all fees and charges pursuant to 5 U.S.C. §§ 552(a)(4)(A)(ii)(II) and (a)(4)(A)(iii). First, the Center is entitled to a waiver of search fees under 5 U.S.C. § 552(a)(4)(A)(ii)(II) because under FOIA it qualifies as a member of the news media. *See National Security Archive v. Department of Defense*, 880 F. 2d 1381, 1387 (D.C. Cir. 1989) ("A representative of the news media is, in essence, a person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience."). The Center is a research institution whose mission is to provide immigration policymakers, the academic community, news media, and concerned citizens with reliable information about the social, economic, environmental, security, and fiscal consequences of legal and illegal immigration into the United States.[2] In service of this mission, the Center regularly obtains information about the operations and activities of government through FOIA and other means, uses its editorial skills and expertise of immigration policy to turn the information into distinct works, and widely disseminates the information through a variety of media platforms for free.[3] (**Attachment 1**.) The Center intends to do likewise with the records it receives through this request.

Secondly, the Center is entitled to a complete waiver of both search and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). Under this provision, records "shall be furnished without any charge or at a charge reduced" if "the disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." *Id*. The Center is a 501(c)(3), not-for-profit, educational and research organization, and, by definition, it has no commercial purpose. The Center exists to educate the public about the operations and activities of the government concerning the issue of immigration. Once the Center obtains the requested records, it intends to analyze and widely disseminate the results of its expert analysis utilizing a

---

[2] *See* https://cis.org/Center-For-Immigration-Studies-Background.
[3] *See* https://cis.org/Publications; *see also* https://cis.org/Podcasts/Parsing-Immigration-Policy; https://www.facebook.com/CenterforImmigrationStudies/; https://twitter.com/CIS_org; https://www.youtube.com/@CenterforImmigrationStudies.

variety of media platforms for free.[4] (**Attachment 1**.) It also will make the records available to other members of the media or researchers upon request. The disclosure of the requested records will shed light on the operations or activities of the government as it pertains to the federal government's responsibility to execute and regulate immigration laws and policy. Furthermore, the Center's proven ability to disseminate its expert analysis of disclosed records will contribute significantly to the public's understanding of how the federal government's particular operations or activities regarding immigration policy and enforcement directly effects U.S. economic and security interests, the environment, and the potential strain on public and private institutions and their resources.

Lastly, access to the requested records should be granted within twenty (20) business days from the date of your receipt of this letter, otherwise the Center is further entitled to a complete waiver of search and duplication fees. 5 U.S.C. § 552(a)(4)(A)(viii). Furthermore, the agency's failure to respond in a timely manner shall be viewed as a denial of this request, and the Center may immediately take further administrative or judicial action.

### C. Request for Expedited Processing

The Center requests expedited processing for the FOIA Request. Pursuant to the Department of Health and Human Services' ("**HHS**") regulations, the Center's FOIA Request qualifies for expedited processing because (1) the failure to obtain the requested records on an expedited basis could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; and (2) there is an urgent need to inform the public about an actual or alleged Federal Government activity. To justify the Center's request for expedited processing, it provides the following facts, and certifies them to be true and correct:

According to news reports, HHS' Office of Refugee Resettlement ("**ORR**") has released more than 600,000 unaccompanied migrant children ("**UAC**") since 2012, and over a third of those releases have occurred since January 21, 2021.[5] According to HHS, in FY2021, FY2022, and FY2023, 107,686, 127,447, and 113,495 UAC respectively were released to "sponsors."[6] A "sponsor" can be a close or distant family member of the UAC, or may have no family relation at all.

According to recent news reports[7]:

> **In March 2021, when ORR was struggling to handle an influx of unaccompanied children, the agency issued new guidance prioritizing the expedited placement of unaccompanied children to limit their time in ORR care.**

---

[4] *Id.*
[5] https://www.nbcnews.com/politics/immigration/advocates-hhs-questions-unaccompanied-migrants-child-labor-rcna87326.
[6] https://www.acf.hhs.gov/orr/grant-funding/unaccompanied-children-released-sponsors-state.
[7] https://www.nbcnews.com/politics/immigration/advocates-hhs-questions-unaccompanied-migrants-child-labor-rcna87326.

3

> **Critics say those changes reduced scrutiny on sponsors who could exploit children for labor.**

Recent reports and investigations conducted and published by the New York Times confirmed many of the UAC have been exploited for labor and find themselves in dangerous living and working conditions.[8]

On April 18, 2023, the Subcommittee on National Security, the Border, and Foreign Affairs held a hearing titled "Oversight of the Office of Refugee Resettlement's Unaccompanied Alien Children Program." On the Committee on Oversight and Accountability's website,[9] the Subcommittee summarized the key takeaways from the hearing, some of which included:

- **The ORR director couldn't answer questions about reports that show HHS has lost contact with more than 85,000 migrant children in the past two years.**

- **Two-thirds of all UAC that leave HHS's care work illegal, full time jobs, often in factories and in hazardous conditions.**

- **Caseworkers within ORR claim that HHS regularly ignored obvious signs of labor exploitation, such as single sponsors sponsoring multiple UAC, "hot spots" in the country where many UAC sponsors are not the children's parents, UAC with significant debts, and direct reports of trafficking.**

- **During the hearing, ORR director admitted that only slightly more than a third of UAC's end up with a parent. "*In this fiscal year, I believe 37 percent of children end up with their parent.*"**

On April 26, 2023, the House Judiciary Subcommittee on Immigration Integrity, Security, and Enforcement held a hearing which included witness testimony from Tara Lee Rodas, HHS Whistleblower, and Federal Inspector General Employee. Ms. Rodas worked at an Emergency Intake Site in California to help ORR reunite children with sponsors in the US. Ms. Rodas' testimony stated,[10]

> **I thought I was going to help place children in loving homes. Instead, I discovered that children are being trafficked through a sophisticated network that begins with being recruited in home country, smuggled to the US border, and ends when ORR delivers a child to a Sponsors – some sponsors are criminals and**

---

[8] https://www.nytimes.com/2023/02/25/us/unaccompanied-migrant-child-workers-exploitation.html.
[9] https://oversight.house.gov/release/hearing-wrap-up-orr-director-fails-to-answer-questions-about-85000-lost-unaccompanied-alien-children-flawed-vetting-of-sponsors-and-more%EF%BF%BC/.
[10] https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/rodas-testimony.pdf.

> **traffickers and members of Transnational Criminal Organizations.**
>
> **My goal is to inspire action to safeguard the lives of migrant children, including the staggering 85,000 that are missing . . . Today, children will work overnight shifts at slaughterhouses, factories, restaurants to pay their debts to smugglers and traffickers. Today, children will be sold for sex. Today, children will call a hotline to report the are being abused, neglected, and trafficked. For nearly a decade, unaccompanied children have been suffering in the shadows.**

Moreover, in a recent exposé titled, *Where Did The Children Go*,[11] four whistleblowers who worked under the frameworks of government contracts involving the sheltering, oversight, and transportation of UAC revealed the dangerous lack of accountability and oversight provided to UAC in government care, as well as during and after their transfer of custody to their respective sponsors. In the exposé, Mayra Moreno, former case manager for UAC under a multimillion-dollar government contract with Cherokee Federal (also known as Cherokee Nation Management & Consulting LLC), said the company attempted to process the UAC as fast as possible, sometimes ignoring clear red flags identified by case workers, that sponsors, or sponsors' homes could be dangerous for the respective UAC.[12]

The exposé also included Carlos Arellano, former Unaccompanied Minor Transportation Specialist for MVM Inc., a company that received multimillion-dollar government contracts to transport UAC to their respective sponsors. Mr. Arellano stated, and showed an email demonstrating that ORR and MVM Inc. knew of instances where Transportation Specialists were handing off UAC to sponsors who did not have proper identification, nor matched the identification the agency had on file.[13]

Ms. Rodas, an HHS whistleblower interviewing Ms. Moreno and Mr. Arellano in the exposé, indicated that such practices "may explain today why there are at least 85,000 children missing from this program, [and] why hundreds of children are calling a hotline to say they are being abused, neglected, and trafficked."[14]

Therefore, based upon the information detailed above, a failure to obtain the requested records on an expedited basis could reasonably be expected to pose an imminent threat to the life or physical safety of hundreds or thousands of individuals. The expedited disclosure of the requested records will provide the public, including law and policy makers, with the information to know whether there are any themes and trends regarding the frequency and geographic locations of the more than 85,000 "missing" UAC. Furthermore, by providing the zip codes of the last known location of the "missing" UAC, the public, including law and policy makers, can identify which communities have been most affected which could result in better resource management, as well

---

[11] https://www.americasfuture.net/where-did-the-children-go/.
[12] *Id*. at 09:35-12:00 (exposé time stamp)
[13] *Id*. at 17:34-21:02 (exposé time stamp)
[14] *Id*.

5

as more direct and localized policy changes and oversight. The information obtained by this FOIA request will aid the public, including law and policy makers, in making critical and time sensitive political and policy decisions and determinations that could provide better protection and follow-up care to UAC that are in or have been transferred from the custody of the federal government. Given the recent credible reports from news outlets and whistleblowers, public hearings conducted by congressional delegates, and the lack of adequate answers provided by relevant agency leadership, any delays to receiving the requested information could reasonably be expected to pose an imminent threat to the life or physical safety of hundreds or thousands of UAC in and being transferred from government custody.

Additionally, based on the information detailed above, there is an urgent need to inform the public about actual or alleged federal government activity. Due to the apparent inadequacies in the administration of programs associated with the sheltering, oversight, and transportation of UAC in the federal government's care, the requested information concerns a matter of current exigency to the American public. The exigency is exemplified by the increased public exposure of the issues in 2023, by news outlets and whistleblowers, and the public hearings conducted by congressional delegates. The federal government has been alleged to have lost more than 85,000 UAC, whistleblowers have exposed serious flaws in the federal government's vetting of sponsors for UAC or providing follow-up care, which has allegedly resulted in exploitive child labor schemes, sex crimes, child trafficking, and possible deaths of children. The information obtained by this request will shed light on whether there are any themes and trends regarding the frequency and geographic locations of the more than 85,000 "missing" UAC. Furthermore, by providing the zip codes of the last known location of the "missing" UAC, the public, including law and policy makers, can identify which communities have been most affected which could result in better resource management, as well as more direct and localized policy changes and oversight. Thus, the FOIA request will aid the public, including law and policy makers, in making critical and time sensitive political and policy decisions that could provide better protection and follow up resources to UAC that are in or have been transferred from the custody of the federal government. The Center, a representative of the news media[15] primarily engaged in disseminating information to the public, is ideally positioned to analyze and widely disseminate the requested information to the public.

Furthermore, delays in obtaining the requested information would compromise significant recognized interests. First, state and federal laws require adequate protection of minors.[16] If the allegations against the federal government and its contractors are true, these entities are in violations of these laws, compromising the significant recognized interest of providing adequate care to minors in their custody, and under their guardianship. Secondly, taxpayers have a significant recognized interest in understanding whether hundreds of millions of dollars of federal funds are being appropriately administered to programs associated with the sheltering, oversight, and transportation of UAC in the federal government's care. Many of these associated contracts are "sole source" contracts, meaning there was no competitive process in the selection of who the contracts were awarded to. Many awardees of these contracts continue to receive federal funding and additional federal contracts. The American taxpayers have a significant recognized interest in information that would help the public know whether their federal tax dollars are being effectively

---

[15] *See* "Fee Waiver Request" section.
[16] *E.g.*, https://statutes.capitol.texas.gov/Docs/FA/htm/FA.261.htm

spent, and not going to unopposed awardees with histories of providing inadequate levels of care to minors.

Therefore, The Center's request for expedited processing should be granted because it has sufficiently shown that (1) the failure to obtain the requested records on an expedited basis could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; and (2) there is an urgent need to inform the public about an actual or alleged Federal Government activity. Agency determination of the Center's request for expedited processing should be granted within ten (10) business days from the date of your receipt of this letter. 5 U.S.C. § 552 (a)(6)(E)(ii)(I). Agency failure to respond in a timely manner shall be viewed as a denial of the Center's request, and the Center may immediately take further administrative or judicial action.

### D. Conclusion

If you would like to discuss the request or any issues raised in this letter, please feel free to contact us at 202-466-8185 ext. 126 or foia@cis.org. For all other formal correspondence regarding this request, please email foia@cis.org. Thank you for your time and attention to this matter.

Sincerely,

Colin M. Farnsworth, Esq.
Chief FOIA Counsel
Center for Immigration Studies

***Attachment 1.***

## DECLARATION OF MARK KRIKORIAN

DISTRICT OF COLUMBIA

I, Mark Krikorian, being duly sworn on oath do say:

1. I am the Executive Director of the Center for Immigration Studies ("**CIS**"), an independent, non-partisan, non-profit 501(c)(3) organization located in Washington, D.C., whose mission is providing immigration policymakers, the academic community, news media, and concerned citizens with reliable information about the social, economic, environmental, security, and fiscal consequences of legal and illegal immigration into the United States.

2. I have been the Executive Director of CIS since 1995. I oversee all the day-to-day operations of the organization. Together with the Board of Directors, I ensure that all efforts are focused on our mission statement and ensure that CIS stays in compliance with all required rules and regulations. I also produce and host CIS' Podcast, titled "Parsing Immigration Policy."[1]

3. In pursuit of its mission, CIS relies primarily on its own investigative reporting. CIS is instrumental in orchestrating cutting edge investigations into the social, economic environmental, security, and fiscal consequences of legal and illegal immigration into the United States, the government's administration and enforcement of immigration laws and policies, and widely disseminates its findings and expert analysis – for free – through various media platforms, including but not limited to CIS' website[2], Facebook page[3], YouTube and Twitter accounts[4], as well as podcasts.

4. According to recent data analytics obtained by CIS, its website has nearly 2 million visits a year; its social media accounts are followed by over 260 thousand users, including over 1 million impressions a month on Twitter, over 1.35 million views in the past year on YouTube, and its Facebook posts reach over 20 thousand users a month.

5. The size of CIS' audience and subscribers continue to grow, illustrative of the wide public interest in the subject of immigration, the government's administration and enforcement of the laws and policies thereof, and CIS' expert ability to investigate, analyze, and publish distinct works on matters of public interest.

---

[1] https://cis.org/Podcasts/Parsing-Immigration-Policy.
[2] https://cis.org.
[3] https://www.facebook.com/CenterforImmigrationStudies/.
[4] https://www.youtube.com/@CenterforImmigrationStudies; https://twitter.com/CIS_org.

6. One of the tools CIS uses to gather the raw materials it uses in its popular investigative reporting, is the Freedom of Information act ("**FOIA**"). CIS uses records it obtains from its FOIA requests to carry out its public mission and to support its role as a non-profit news media organization in the field of immigration. As a non-profit, CIS does not have a commercial interest in the records it seeks through FOIA.

7. Based on what I know as the Executive Director, as well as what has been demonstrated by CIS' past and current investigative reporting, for purposes of FOIA's free waiver provisions, CIS certainly qualifies as a "representative of the news media."

Signed 31st day of October 2023

_____
Signature of Mark Krikorian

I, _Kenneth Wyatt Lightfoot IV_____ Notary Public for the ~~District of Columbia~~ State of Texas KWL IV witnessed said Mark Krikorian sign the above statement this __31st__ day of ____October____, 2023

Kenneth Wyatt Lightfoot IV
ID NUMBER
13433248-0
COMMISSION EXPIRES
April 28, 2027

Notarized online using audio-video communication

Page 2 of 2